IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

DONALD BELLAIRS, )
 )
        Plaintiff, ) Civil No. 04-770-JO
 )
    v. ) <u>OPINION AND ORDER</u>
 )
BEAVERTON SCHOOL DISTRICT; ET AL., )
 )
        Defendants. )

   Thomas K. Doyle
   BENNETT HARTMAN MORRIS & KAPLAN, LLP
   111 S.W. Fifth Avenue, Suite 1650
   Portland, OR 97204

    Attorney for Plaintiff

   Jennifer L. Hungerford
   Nancy J. Hungerford
   THE HUNGERFORD LAW FIRM
   615 High Street
   Oregon City, OR 97045

    Attorneys for Defendants

JONES, Judge:

Plaintiff Donald Bellairs brings this action against the Beaverton School District ("District"), District Superintendent Jerome Colonna, and Beaverton School Board Chairman Craig Irwin in their official and personal capacities, alleging retaliation for constitutionally protected speech under 42 U.S.C . § 1983 ("free speech"), denial of property without due process ("due process"), and two state law tort claims: defamation, and intentional interference with economic relations ("IIER"). Specifically, Plaintiff claims that his comments to Superintendent Colonna after a faculty meeting were constitutionally protected and a direct cause of his dismissal. Plaintiff also claims that he was denied a property interest in his continued employment, defamed and suffered economic harm when a District secretary inaccurately reported to a mortgage lender that Plaintiff had resigned from the District.

Defendants move for summary judgment on all issues. For the reasons explained below, Defendants' motion (#26) is GRANTED for Plaintiff's due process, defamation and IIER claims and DENIED for Plaintiff's free speech claim.

BACKGROUND

Plaintiff taught full-time in the Beaverton School District between 1997 and February 23, 2004, when the District Board voted to terminate him on the recommendation of Superintendent Colonna. During that time, he taught English, Creative Writing and Media Studies. Fair Dismissal Appeals Board ("FDAB") Tr., 637. Plaintiff was hired by the District as a teacher at Meadow Park Middle School in the fall of 1997. The District had concerns about Plaintiff's behavior in the spring of 1999 when a school counselor and the school principal spoke with

2 - OPINION AND ORDER

Plaintiff concerning complaints from parents of students in his classroom. FDAB Tr., 644, 740; Borquist Affd., Ex. C, 2.

That fall, Plaintiff began teaching at the District's Westview High School. Borquist Affd., Ex. C, 5. Two years later, the departing Westview High Principal appointed Plaintiff to the position of Activities Director for the 2002-2003 school year. Borquist Affd., Ex. C, 6. Prior to the start of the 2003-2004 school year, the new Principal appointed Vice Principal Chamberlain to be Plaintiff's immediate supervisor. Borquist Affd., Ex. C, 9-10.

In the Fall of 2003, Chamberlain issued a reprimand letter to Plaintiff in response to a dispute between Plaintiff and a parent regarding an issue that arose with the girls' football team that Plaintiff had volunteered to coach. Response, 2. Chamberlain's reprimand letter included a directive instructing Plaintiff to: "first communicate with me any concerns you have with staff and/or parents so that letters or e-mail sent are appropriate. In addition, you are instructed to first see [me] when you have a potential conflict with a staff member or parent." Borquist Affd., Ex. A, 23.

Plaintiff was dismissed on February 23, 2004. Superintendent Colonna outlined six "facts" supporting his recommendation for dismissal in a letter to Plaintiff dated February 3, 2004.[1] Borquist Affd., Ex. A, 1-7. The fifth "fact" cited in that letter was Plaintiff's conduct

---

[1] The letter recommending dismissal uses the word "facts" to describe the District's allegations against Plaintiff. My use of quotation marks around the word "facts" is therefore meant to indicate that these are the District's allegations, not proven facts. In the letter, "facts" one through three detailed numerous alleged disputes between Plaintiff and various students, families, and staff members between 1998 and 2003 including allegations that Plaintiff: "threatened a parent by stating that his daughter may have committed an immoral or illegal act," "inappropriately told [a] student * * * that because he had returned a video camera a day late he would not be allowed to use any classroom equipment for the remainder of the year," was "angry
(continued...)

after a staff meeting on January 14, 2004, in which Superintendent Colonna invited faculty to meet in a small group setting and have an "open" and "frank" discussion about whatever concerns they had at the school. FDAB Tr., 395, 567.

I.      Speaking Out

I take the following facts as alleged by Plaintiff to be true. Fed. R. Civ. P. 56. Following a staff meeting on January 14, 2004, six teachers and four administrators, including Plaintiff's direct supervisor, Mike Chamberlain, met in a small group with Superintendent Colonna. FDAB Tr., 567. In that meeting, Plaintiff asserted that students from wealthy or influential families were improperly favored by the District. FDAB Tr., 396. To illustrate his point, Plaintiff showed Superintendent Colonna a picture of a student in the school newspaper who had played a lead part in a school play and whose parents were prominently involved in fund-raising.[2] Id. Plaintiff said "who knows, maybe she may have even deserved the lead in the play." Id. Plaintiff said this "to indicate that the appearance of impropriety endemic in the school actually worked to the detriment of the students who were perceived as being favored." Response, 3. According to one observer, Plaintiff "was insinuating very clearly that [the student] wasn't

---

[1](...continued)
and loud" in relation to other staff members, failed to show up for a meeting with a Principal and Associate Superintendent to discuss concerns about Plaintiff's behavior, "allowed a student to input attendance information into the Teacher Assistance program of eSIS, when only staff were allowed to do so," and stated to Assistant Principal Mike Chamberlain that Mr. Chamberlain "needed to 'do what's right and not cave in to self-interested parents who believe the system should serve a few kids well and give the vast majority what is left.'" Borquist Affd., Ex. A, pp. 1-4. "Fact" four detailed a co-worker's allegation of sexual harassment against Plaintiff. Id.

[2] Plaintiff had not brought the copy of the school newspaper to the meeting. Hungerford Affd., Attachment I, p. 44. It was one of several dozen copies that were in the classroom where the conversation was taking place. Id.

4 - OPINION AND ORDER

deserving of the part, that she got it because her parents in his opinion were influential and money was being diverted through fundraising to a program that either wasn't appropriate or didn't need it." FDAB Tr., 396. Specifically, Plaintiff felt that the drama club was insulated from budget cuts due to the support of influential families: "we were all being asked to tighten our belts, and there were places where they weren't being asked to tighten their belts. Those seemed to be places that served people of privilege." FDAB Tr., 729. Plaintiff also protested the treatment of a disabled teacher and an African-American teacher. FDAB Tr., 727. Plaintiff's comments were neither inappropriate, confrontational, loud, nor disrespectful. FDAB Tr., 572, 730.

Defendants claim that Plaintiff's conduct at the January 14, 2004 meeting violated the directive Chamberlain had given Plaintiff on October 16, 2003 to: "first see [me] when you have a potential conflict with a staff member or parent." Borquist Affd., Ex. A, 23. As a result of Plaintiff's conduct at the January 14th meeting, Chamberlain placed Plaintiff on administrative leave on January 26, 2004. Borquist Affd., Ex. C, 14. This prevented Plaintiff from turning in his grades by the deadline of 9 a.m. on January 27th since doing so would have required violating Chamberlain's directive to "not be present on any Beaverton School District Property or Beaverton School District event during the time of this leave. If [Plaintiff] does not comply with this directive, he could be cited with criminal trespass." Response, Ex. 1. Plaintiff's late turn-in of grades was the sixth and final "fact" cited in Superintendent Colonna's letter recommending dismissal. Borquist Affd., Ex. A, 4.

II. Employment Status Verification

On February 20, 2004 a District secretary inaccurately reported on a mortgage lender's employment verification form that Plaintiff had "resigned effective 2/23/04." Koehler Affd. Ex. A. The secretary incorrectly interpreted a "Term Date" notation in the District's computer database. According to the technical coordinator who made the "Term Date" notation:

> To ensure that teachers are not overpaid for work they do not perform, the District will indicate a "Term Date" in the financial system if there is a possibility that the teacher's employment will be ending at a specific time. It is less problematic for the District to authorize wages to be paid than to recoup wages paid erroneously. * * * I was notified that on February 23, 2004, the Beaverton School Board would be holding a hearing on the Superintendent's recommendation to dismiss [Plaintiff]. Therefore, I listed a "Term Date" of February 23, 2004 in the district financial computer system for [Plaintiff] to ensure proper payment as there was a possibility that [Plaintiff's] employment would be ending on that date. * * * If [Plaintiff] had not been dismissed on that date, I would have changed the "Term Date" in the system to ensure proper payment.

Aimi Affd., 2-3.

Plaintiff was dismissed on February 23, 2004 following the Board's discussion of Superintendent Colonna's recommendation for Plaintiff's dismissal. Plaintiff administratively appealed his dismissal.

On June 16-18, 2004, an administrative hearing was held before the FDAB. At that hearing, the FDAB considered whether the statutory grounds for dismissal had been satisfied. On July 21, 2004, the FDAB issued a decision upholding Plaintiff's termination. Plaintiff's appeal of that decision is currently pending before the Oregon Court of Appeals.

## STANDARD

Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. The initial burden is on the moving party to point out the absence of any genuine issue of material fact, the burden then shifts to the opponent to demonstrate through the production of probative evidence

6 - OPINION AND ORDER

that there remains an issue of fact to be tried. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). In order to defeat a summary judgment motion, there must be enough doubt for a reasonable trier of fact to find for the non-moving party. Wallis v. J.R. Simplot Co., 26 F.3d 885, 889 (9th Cir. 1994).

## DISCUSSION

I.  Free Speech Claim

Defendants move for summary judgment on Plaintiff's free speech claim asserting that (1) Plaintiff's claim is precluded by the FDAB decision; (2) no reasonable juror could find that defendants retaliated against Plaintiff for constitutionally protected speech; and (3) the individual defendants are entitled to qualified immunity.

A.  Non-Preclusive Effect of the FDAB Decision

An unreviewed FDAB decision with a pending appeal does not have preclusive effect on a free speech claim because the FDAB is not a court of law and is therefore not empowered to resolve constitutional claims.

The FDAB only has the statutory power to "determine whether the facts relied upon to support the statutory grounds cited for dismissal or nonextension are true and substantiated." ORS 342.905(6). No depositions and only limited paper discovery were allowed at Plaintiff's FDAB hearing and the decision-maker was a panel of three citizens who did not have law degrees or expertise in administrative law. Masih Affd., p. 2. The first time that constitutional objections to the dismissal could be properly evaluated was on appeal from the FDAB decision to the Oregon Court of Appeals. ORS 342.905(9). The Oregon Court of Appeals has the power

to remand the FDAB's order back to the agency if the court finds the agency's exercise of discretion to be "in violation of a constitutional or statutory provision." ORS 183.482(8)(b)(C).

Defendants argue that the FDAB decision has preclusive effect on Plaintiff's free speech claim, citing Vilches v. Multnomah Education Service District, 2004 WL 1661986 (D.Or. July 23, 2004). In Vilches, the court held that the Plaintiff's Section 1983 claim was barred by the Oregon Court of Appeals' affirmation of the FDAB decision. Id. at * 3. An appeal to the Oregon Court of Appeals is still pending in the present case, so no judgment has been rendered by a court of law and no constitutional claim or issue has been precluded.[3]

B.     Merits of Free Speech Claim

A genuine issue of material fact exists on the merits of Plaintiff's free speech claim. "It is well-settled that a teacher's public employment cannot be conditioned on her refraining from speaking out on school matters." Settlegoode v. Portland Pub. Schs., 371 F.3d 503, 516 (9th Cir. 2004). When a government employee alleges that he has been punished in retaliation for exercising his First Amendment rights, he must satisfy a three-part inquiry. Id. at 510. To prevail, the employee must prove (1) that the conduct at issue is constitutionally protected, and (2) that it was a substantial or motivating factor in the punishment. Id. Even if the employee discharges that burden, (3) the government can escape liability by showing that it would have taken the same action even in the absence of the protected conduct. Id.

---

[3] Defendants correctly state that "a pending appeal does not affect the preclusive effect of a judgment." Lee v. Mitchell, 152 Or.App. 159, 167 n. 11, 953 P2d. 414 (1998). However, the judgment in Lee was rendered by a trial court, not an administrative appeals board. Therefore, I conclude that a "judgment" not issued by a court of law does not have preclusive effect under Lee.

8 - OPINION AND ORDER

In order for the Plaintiff to prove that his speech is constitutionally protected he must prove that it (1) involved a matter of public concern, and (2) that the employee's interest in freedom of speech outweighs the public employer's "legitimate administrative interests." Pool v. VanRheen, 297 F.3d 899, 906 (9th Cir. 2002). Courts balance the employee's interest in free expression versus the government employer's interest in workplace disruption to decide what is or is not a legitimate administrative interest. Pickering v. Board of Educ., 391 U.S. 563 (1968); Settlegoode, 371 F.3d at 514.

Plaintiff has shown that there is a triable issue of material fact on each of these elements.

1. Matter of Public Concern

There is a genuine issue of material fact as to whether Plaintiff's comments at the January 14, 2004 meeting were on a matter of public concern. Defendants argue that the comments were not on a matter of public concern but rather were his personal grievances against a particular family in the District. Plaintiff argues that he was calling attention to "equity concerns" regarding the perception of unequal treatment between students from rich and poor families.

Although the boundaries of the public concern test are not well-defined, lower courts have been directed to examine the "content, form, and context of a given statement, as revealed by the whole record" in assessing whether an employee's speech addresses a matter of public concern. Connick v. Myers, 461 U.S. 138, 146-147 (1983). The mere fact that comments were expressed to public officials privately, rather than publicly, will not deprive the speaker of First Amendment protections. Cellabos v. Garcetti, 361 F.3d 1168, 1174 (9th Cir. 2004).

9 - OPINION AND ORDER

The standard for determining whether an expression is of public concern is the same standard used to determine whether a common-law action for invasion of privacy is present. Connick, 461 U.S. at 143, n.5. In other words, the public has the same interest in the free dissemination of information regardless of whether a private party or governmental body is opposed to that dissemination. Therefore, public concern is something that is "a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public at the time of publication." City of San Diego v. Roe, 125 S.Ct. 521, 526 (2004).

Speech regarding disparity in treatment between disabled and non-disabled students qualifies as a matter of public concern. Settlegoode, 371 F.3d at 513. Even a private expression of regret that the President of United States survived an assassination attempt can touch on matters of public concern. See Rankin v. McPherson, 483 U.S. 378 (1987) (holding that a statement by a clerical employee, made in the course of a conversation with a co-employee addressing the policies of President Reagan's administration, that, "if they go for him again, I hope they get him" dealt with a matter of public concern).

All of the above leads me to conclude that equity issues such as those identified by Plaintiff at the January 14, 2004 meeting qualify as matters of public concern. Whether Plaintiff's raised these issues of public concern or merely aired private grievances is a question of fact that is properly left to a jury.

2. Pickering Balancing Test

The relevant considerations in applying the Pickering test are whether Plaintiff's statement (1) impaired discipline or control by his superiors; (2) disrupted harmony among co-workers; (3) had a detrimental impact on close working relationships for which personal loyalty

and confidence are necessary; (4) impeded the performance of Plaintiff's duties; or (5) interfered with the regular operation of the school. Nelson v. Pima Community College, 85 F.3d 1075, 1081 (9th Cir. 1996). Further, when applying the Pickering test, a court must give government employers "wide discretion and control over the management of [their] personnel and internal affairs." Brewster v. Board of Ed., 149 F.3d 971, 979 (9th Cir. 1998) (quoting Connick, 461 U.S. at 151).

Defendants argue that Plaintiff's comments impaired discipline by violating a directive to first address "any concerns you have with staff and/or parents" to Chamberlain. However, Plaintiff was expressing concerns about District policy, not individual staff or parents. Plaintiff therefore did not violate the directive and so did not impair discipline or control by his superiors.

No evidence has been presented that Plaintiff's comments disrupted harmony among co-workers or had a detrimental impact on close working relationships. Again, Plaintiff was challenging policy, not people. Plaintiff's comments were polite, quiet, and circumscribed. None of his co-workers expressed offense, nor is there any evidence that Plaintiff's comments impeded the performance of Plaintiff's duties or interfered with the regular operation of the school.

The District's legitimate administrative interests did not outweigh the Plaintiff's right to express his concerns in the manner Plaintiff claims he did. Therefore, Defendants are unable to show that Plaintiff's speech was sufficiently disruptive to fail the Pickering test.

      3.    Substantial or Motivating Factor

A reasonable person could conclude that the January 14th incident was a substantial or motivating factor in the Plaintiff's dismissal. A substantial or motivating factor can also be described as a significant factor. Ostad v. OHSU, 327 F.3d 876, 885 (9th Cir. 2003). In Ostad, a

doctor successfully sued his former employer for dismissing him in retaliation for questioning his former supervisor's billing practices. Id. at 879. In contrast to the present case, the Ostad plaintiff's questioning of his former supervisor's billing practices was never stated as a reason for his dismissal, yet a jury was permitted to find that it was a "substantial or motivating factor" for the dismissal nonetheless. Id. at 885. The 9th Circuit upheld an instruction to the jury that "a substantial or motivating factor is a significant factor," and noted that "the defendants bear the burden of establishing their affirmative defense and * * * it would be improper to require that a plaintiff surmount it as part of the 'substantial or motivating' factor analysis." Id.

The current case is even more clear-cut than Ostad. Here, unlike in Ostad, Plaintiff's conduct at the January 14, 2004 meeting was *explicitly listed* as the fifth out of six "facts" that led to Plaintiff's termination in the February 3rd letter recommending dismissal. Borquist Aff., Exhibit A. No guesswork is required to conclude that Plaintiff's speech was a factor in his dismissal. Each of the six "facts" in this letter can be fairly considered significant factors in the Plaintiff's dismissal since it is unclear why such a letter would include a non-significant factor to support an employee's dismissal. Non-significant factors in a dismissal would be factors that may have affected the decision for dismissal but were not deemed important or defensible enough to spell out.[4] The fact that the District took the time and effort to list Plaintiff's speech as the penultimate factor in a list of six factors suggests that the speech was a significant, substantial and motivating factor in the dismissal.

Defendants raise an issue of causation by suggesting that the final straw was the late turn-in of grades, which may or may not have occurred if Plaintiff had not been placed on

---

[4]Examples may include an employee's appearance, demeanor, eating habits, odor, etc.

12 - OPINION AND ORDER

administrative leave as a result of his comments at the January 14th meeting. Ostad addressed a similar causation question when the court upheld a jury instruction that

> [y]ou may find that plaintiff's protected speech was a motivating factor in his termination, even if the final decision-makers at plaintiff's termination hearing were not motivated to retaliate against plaintiff, if you find that the person who set in motion the chain of events that led to plaintiff's termination was motivated to retaliate against plaintiff for his protected speech.

Id.

Here, Superintendent Colonna stated that the late turn-in of grades would not, by itself, form the basis for a recommendation for termination but, when combined with the January 14th incident, it would make him want to "investigate more deeply." Colonna Dep., p. 35. All of the above could permit a reasonable person to conclude that the Plaintiff's speech was a substantial or motivating factor in the District's dismissal of Plaintiff.

### C. Qualified Immunity

None of the Defendants are entitled to a grant of qualified immunity on summary judgment. Individual Defendants, as public officials, are entitled to qualified immunity unless (1) they violated the clearly established First Amendment rights of the Plaintiff and (2) their mistake regarding Plaintiff's First Amendment rights was not reasonable. Sweet v. Tigard-Tualatin School Dist., 2005 WL 19531, at **2 (9th Cir. 2005). The plaintiff in Sweet, a school psychologist, was dismissed after she reported potential violations of the Individuals with Disabilities Education Act. Id. at **1. The Sweet plaintiff's "manner of communicating her concerns was in some respects disruptive. Her co-workers complained to supervisors that she was hard to work with. Any mistake by the public employees with regard to Sweet's free speech rights was thus within the 'hazy border' between lawful and unlawful conduct." Id. at **3. The individual defendants in Sweet were therefore entitled to qualified immunity. Id.

13 - OPINION AND ORDER

Here, Defendants have not provided any evidence to show that Plaintiff's co-workers were similarly disrupted by Plaintiff's comments at the January 14th meeting. Therefore, the outcome of the Pickering balance using Plaintiff's version of the facts is not close enough to grant a summary judgment of qualified immunity to any Defendant.

Defendants also argue that since "Plaintiff's manner of communicating his concerns referenced a specific student and family and violated a specific directive to see his supervisor in advance so problems could be avoided, the individual Defendant's actions in dismissing Plaintiff [were] reasonable as a matter of law." Defendants' Memorandum in Support of Motion for Summary Judgement, p. 22. However, neither the fact that Plaintiff referenced a specific student nor the fact that he violated a directive from his supervisor has any relevance as to whether or not it was reasonable for the individual Defendants to believe that Plaintiff's speech regarding equity issues was not constitutionally protected. Therefore, none of the Defendants are entitled to qualified immunity.

II.  Due Process Claim

The Fourteenth Amendment protects against the deprivation of property or liberty without due process. See Carey v. Piphus, 435 U.S. 247, 259 (1978); Brady v. Gebbie, 859 F.2d 1543, 1547 (9th Cir. 1988). Plaintiff claims that he was "administratively terminated" on February 20, 2004 when a District secretary inaccurately reported that he had resigned prior to any official school board action. Plaintiff claims that he was therefore deprived of his property interest in continued employment without due process. However, Plaintiff has not shown that he was denied any salary for February 20-22, 2004 nor is there any other evidence to support a finding that Plaintiff was terminated, administratively or otherwise, prior to February 23, 2004.

Plaintiff has put forth no evidence to support a finding that either the District secretary who gave the inaccurate report to the mortgage company or the technical coordinator who entered the Plaintiff's "Term Date" as February 23, 2004 into the District computer system had the authority or intent to terminate the Plaintiff's employment.

Plaintiff would not even have a valid claim that he was denied his property interest in employment *status* due to the nature of the mortgage company's request form, which specifically asks for the "Probability of Continued Employment." Koehler Affd., Ex. A, Item 11. No accurate response to that question would have resulted in a more positive result for Plaintiff, since a Board meeting was scheduled for February 23, 2004 to discuss Plaintiff's potential dismissal. Plaintiff's employment status was on unstable ground and the mortgage company was entitled to knowledge of that fact. Defendants' motion for summary judgment is therefore granted on the due process claim.

III.  Defamation Claim

To be actionable, a communication must be both false and defamatory. Reesman v. Highfill, 327 Or. 597, 603, 965 P.2d 1030 (1998). A defamatory communication is one that would subject another to "hatred, contempt or ridicule or tend to diminish the esteem, respect, goodwill or confidence in which the other is held or to excite adverse, derogatory or unpleasant feelings or opinions against the other." Id.

A successful defamation claim, like any other successful tort claim, must show that the plaintiff suffered harm as a result of the defendant's wrongful actions. Here, no reasonable juror could find that Plaintiff suffered harm as a result of the District secretary's inaccurate response to the mortgage lender's Request for Verification of Employment.

15 - OPINION AND ORDER

The secretary inaccurately reported that Plaintiff had "resigned effective 2/23/04." Koehler Affd., Ex. A. A hypothetical, accurate report would have stated that there was a meeting scheduled for February 23, 2004 to discuss Superintendent Colonna's recommendation to the school board to dismiss Plaintiff. The actual, inaccurate report and the hypothetical, accurate report would both require a follow-up investigation by the mortgage company. See Koehler Affd., Ex. A, Item 11 (the portion of the mortgage company's Request for Verification of Employment that asks for "Probability of Continued Employment"). The actual, inaccurate report that Plaintiff had resigned would require the mortgage company to contact Plaintiff in order to determine whether he had found a new job. The hypothetical, accurate report would require the mortgage company to contact the District after February 23, 2004 to determine whether he had, in fact, been dismissed. Upon learning that Plaintiff had been dismissed, the mortgage company would have needed to contact Plaintiff to determine whether he had found a new job. An accurate report would, therefore, have had either the same effect or a more negative effect on Plaintiff's chances of obtaining a mortgage. The facts, therefore, cannot support a finding that the Plaintiff suffered either pecuniary or reputational harm as a result of the false report to the mortgage company.

IV.     IIER Claim

Similarly, a claim for intentional interference with economic relations requires a plaintiff to prove a causal effect between the interference and damage to the economic relationship. McGanty v. Staudenraus, 321 Or. 532, 535, 901 P.2d 841 (1995). Plaintiff contends that he failed to obtain a mortgage loan as a direct consequence of the District secretary's inaccurate report to the mortgage company. Response, 23. As explained above, Plaintiff has not put forth

evidence to allow a reasonable jury to find that Plaintiff suffered harm resulting from the false report to the mortgage company that he would not have suffered from an accurate report. That is, Plaintiff has not shown that he would have been more likely to obtain financing from the mortgage company if the District secretary had accurately reported his probability of continued employment. The Defendants are therefore granted summary judgment on the IIER claim.

## CONCLUSION

Defendants' motion (#26) for summary judgment is GRANTED on the due process, defamation, and IIER claims and DENIED on the free speech claim.

DATED this 26th day of July, 2005.

      /s/ Robert E. Jones
      ROBERT E. JONES
      U.S. District Judge